IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In re: Ernesto T. Negron, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Case No. 15-73163-WLH |
| ———————————————— | ) | |
| | ) | |
| R. Matthew Wadsworth, individually, | ) | |
| and on behalf of Firm Tech, Inc., as putative | ) | |
| Assignee of Firm Tech, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. _____ |
| v. | ) | |
| | ) | |
| Ernesto T. Negron, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## VERIFIED COMPLAINT OF R. MATTHEW WADSWORTH OBJECTING TO DEBTOR'S DISCHARGE AND TO DISCHARGEABILITY OF CERTAIN DEBT OBLIGATIONS

Mr. R. Matthew Wadsworth ("*Plaintiff*"), creditor and party-in-interest in the above-captioned matter, files his complaint against debtor Ernesto T. Negron (the "*Debtor*" or "*Defendant*") pursuant to sections 523(a)(2), 523(a)(4), and 523(a)(6); and 727(a)(2), 727(a)(3), and 727(a)(5), and 727(a)(7) of title 11 of the United States Code, respectfully showing the Court the following:

## PRELIMINARY STATEMENT

1.

Plaintiff R. Matthew Wadsworth brings this action on behalf of himself and on behalf of Firm Tech, Inc., as the putative Assignee of Firm Tech, Inc. pursuant to the terms of that certain agreement (the "*9019 Agreement*") entered into on or about May 13, 2016, between Plaintiff and

Robert Trauner, in his official capacity as the Chapter 7 bankruptcy trustee (the "*Firm Tech Trustee*") of the bankruptcy estate (the "*Firm Tech Estate*") of Firm Tech, Inc. ("*Firm Tech*" or the "*Company*"), which filed a Chapter 7 bankruptcy petition in this Court on November 30, 2015.  Firm Tech is a debtor in this Court in Case No. 15-72762-mgd.[1]

2.

Pursuant to the 9019 Agreement, the Firm Tech Trustee, subject only to the approval of the 9019 Agreement by Judge Mary Grace Diehl, who is presiding over Firm Tech's bankruptcy case (the "*Firm Tech Bankruptcy Case*") assigned to Plaintiff on an "as is and without recourse" basis, any and all prepetition or postpetition claims that the Firm Tech bankruptcy estate has: (a) against David N. Boughter, Jr. ("*Boughter*"), Eric D. Jordan ("*Jordan*"), and Ernesto T. Negron ("*Negron*" or, in this adversary proceeding, the "*Debtor*"; together with Boughter and Jordan, the "*Debtors*"), or their immediate family members, and/or Strategic Integration Partners, LLC, a Georgia limited liability company ("*SIP*") and/or its successors or affiliates (the "*Derivative and Avoidance Claims*"); and (b) against any other person or entity arising out of, or related to, the Derivative and Avoidance Claims, and/or related to the filing of the Firm Tech Bankruptcy Case (the "*Associated Claims*"; and, together with the Derivative and Avoidance Claims, collectively, the "*Assigned Claims*").

3.

In return for the assignment to Plaintiff of the Assigned Claims, Plaintiff has agreed, subject only to the approval of the Agreement by Judge Diehl to, *inter alia*, use all commercially reasonable efforts of himself and his counsel to:  (a) pursue, either to a negotiated resolution or

---

[1] The 9019 Agreement is Exhibit "A" to that certain "*Motion to Approve Compromise, Settlement and Assignment of Claims*" filed in the Firm Tech Bankruptcy Case [Doc. No. 81] on May 13, 2016.  The hearing on the motion is set for June 7, 2016, at 10:30 a.m. before the Hon. Mary Grace Diehl.

final judgment the Assigned Claims, together with any claims which he personally has against Boughter, Jordan, Negron, and/or SIP, their affiliates, family members, or successors (the "**_Individual Claims_**"); and (b) pursue, either to a negotiated resolution or final judgment, one or more adversary proceedings to bar under 11 U.S.C. § 523, the dischargeability of the Assigned Claims, together with his Individual Claims; and to either pursue to a negotiated resolution or final judgment, or assist the Office of the US Trustee in pursuing to negotiated resolution or final judgment, one or more adversary proceedings to bar, under 11 U.S.C. § 727, the discharges of Boughter, Jordan and Negron, based upon actions or omissions arising from or related to the Assigned Claims, together with his Individual Claims.

4.

By this Complaint, Plaintiff seeks to bar the dischargeability of his Individual Claims and the Assigned Claims against Defendant under 11 U.S.C. § 523, and to bar the discharge of Defendant under 11 U.S.C. § 727; thereby fulfilling his duties and responsibilities under the 9019 Agreement with the Firm Tech Trustee.  Moreover, if and to the extent that the Firm Tech Trustee may be deemed to be a party in interest required to participate in this adversary proceeding, the Firm Tech Trustee, as evidenced by the signature of his counsel set forth below, has joined as a party Plaintiff in this Complaint.

**THE PARTIES**

5.

Plaintiff is a creditor of the Debtor.  Plaintiff has been scheduled as holding a claim against Defendant's chapter 7 bankruptcy estate (the "**_Estate_**") in the amount of $1,000,000.00. Plaintiff is a Georgia resident.

- 3 -

6.

Firm Tech, while not being scheduled by the Defendant as holding a claim against the Estate, is a creditor of Defendant and holds one or more claims against Defendant.

7.

Defendant is a resident of Georgia who maintains his principal residence, and may be served, at 1052 Bream Drive, Alpharetta, Georgia 30004.

8.

On December 2, 2015 (the "***Petition Date***"), Defendant filed a voluntary petition under chapter 7 of the Bankruptcy Code.  Ms. Dale Goodman is the Chapter 7 Trustee of Defendant's bankruptcy estate.

9.

Plaintiff and Defendant each own a 25% interest in Firm Tech.  Plaintiff was a shareholder of Firm Tech at all times relevant to this proceeding and the transactions complained of herein.

## **JURISDICTION**

10.

This matter is an adversary proceeding which arises in and relates to *In re Ernesto T. Negron*, Case No. 15-73163-WLH, pending in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).  Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

11.

This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.  Plaintiff is bringing certain of the claims alleged in this Complaint rather than the Firm Tech Trustee as a result of the 9019 Agreement described above.

## BACKGROUND FACTS

12.

Prepetition, Firm Tech was in the business of providing mainly law firms with affordable and reliable managed IT support, hardware licensing, and related services.

13.

As of its petition date, Firm Tech had four shareholders:  Plaintiff, Defendant, Boughter, and Jordan (the "***Shareholders***"), who each held a 25% interest in the company.  Mssrs. Boughter and Jordan have also filed chapter 7 bankruptcies that are pending before this Court.

## The Cobb County Litigation

14.

Prepetition, Mssrs. Boughter, Jordan, and Negron (the "***Debtors***") were all defendants in a lawsuit brought against them by Plaintiff in March 2015 in Cobb County, Georgia (the "***Cobb County Litigation***").  In the Cobb County Litigation, Plaintiff alleges, *inter alia*, that the Debtors (i) breached various contractual duties to Plaintiff and the Company; (ii) committed fraud & concealment against Plaintiff and the Company through material misrepresentations regarding the Company's assets; (iii) breached their fiduciary duties to the Company; and (iv) violated an injunction entered by the Cobb County Court, from which no appeal was taken.  Specific allegations from the Cobb County Litigation follow below.

- 5 -

15.

The Company paid the Debtors' legal expenses in the Cobb County Litigation even though the Company was not an active party to the Cobb County Litigation.  The Company did not have separate counsel in the Cobb County Litigation.

**Plaintiff's Wrongful Termination and the Valuation of Firm Tech**

16.

On September 2, 2014, Plaintiff received a notice that he was being terminated as an employee of Firm Tech.  This notice terminated Plaintiff without cause and there was no meeting of the Shareholders prior to the notice being issued to Plaintiff.

17.

As of the date of Plaintiff's termination, the Shareholders were parties to a Shareholders Cross Purchase Agreement (the "***Agreement***"), a true and correct copy of which is attached as Exhibit "A".  Plaintiff's termination triggered the contractual right to repurchase Plaintiff's shares in the Company.

18.

The Shareholders and the Company stipulated in the Agreement that the cost to repurchase any one shareholder's stock was $1,000,000.00, except under various circumstances which were not applicable to Plaintiff's termination without cause.  The Shareholders had valued the Company at $4,000,000.00 under the Agreement and taken out corresponding insurance policies on each of their lives for $1,000,000.00 each.

19.

Rather than pay Plaintiff the stipulated value of his shares upon his termination as set forth in the Agreement or any other amount, however, Debtors and the Company, as directed by,

and under the control of the Debtors, decided to engage a valuation company to value Firm Tech. Plaintiff did not agree that the valuation commissioned by the Debtors and the Company, as directed by, and under the control of the Debtors, would be binding and instead made demand to be paid the value of his shares under the Agreement.  However, the Debtors and Firm Tech commissioned HDH Advisors ("***HDH***") to value the Company, over Plaintiff's objection.

20.

In order to complete its valuation of the Company, HDH relied upon various representations and financial records of the Company provided to HDH by the Debtors in writing.

21.

Based upon the information HDH received from the Debtors and the Company, HDH valued the company at $284,000.00 effective as of December 31, 2004, or $71.00 per share.

22.

This valuation was undervalued and was determined by HDH based upon incomplete information provided to HDH by the Debtors and Firm Tech.  The Debtors and the Company, as directed by, and under the control of the Debtors, failed to provide HDH with information pertinent to HDH's evaluation in order to conceal the health of the Company from HDH.

23.

 The Debtors and the Company, as directed by, and under the control of the Debtors, "doctored" the financials of the Company in connection with the valuation performed by HDH in order to make the Company look less fiscally sound than it was in reality.  For example, upon information and belief, HDH was not provided with a live version of the Company's Quickbooks accounting records.  The Debtors also failed to turn over to HDH a host of information that in

good faith should have been provided so that HDH could complete an accurate valuation of the Company.    The Debtors' fraudulent and intentional misrepresentations, concealments, and omissions (the "***Misrepresentations***") were material to HDH's valuation of the Company.

24.

Additionally, the Debtors took measures to hide the true profits of the Company in 2014 and 2015.  For example, the Debtors failed to disclose to HDH that they were taking profits out of the Company annually through writing themselves checks disguised as "salary".  *See infra*.

25.

Plaintiff deposed HDH in the Cobb County Litigation following the rendering of its valuation report.  During the course of the deposition, Plaintiff presented Tim Hillegrass of HDH with various information that the Debtors and the Company, as directed by, and under the control of the Debtors, had failed to provide him while he was in the course of gathering research for his valuation.    As a result of being made aware of this information during his deposition, Mr. Hillegrass stated on the record that he was not comfortable with the valuation he had assigned the Company, on behalf of HDH.

26.

The Misrepresentations were made knowingly to deceive Plaintiff with the intent that Plaintiff would accept an offer to purchase his shares at a substantially undervalued price.

27.

The Debtors and the Company, as directed by, and under the control of the Debtors, also systematically failed to provide Plaintiff with basic information about the financial health of the Company in his capacity as a shareholder until the Cobb County court ordered them to turn various financial records over to Plaintiff.

- 8 -

28.

But for the Debtors' Misrepresentations, the valuation of the Company would have been substantially higher.   Furthermore, Plaintiff's reliance upon the Misrepresentations and the resulting damage were reasonably foreseeable to and intended by the Debtors and the Company, as directed by, and under the control of the Debtors.

29.

Plaintiff and the Company have been damaged by the Debtors' willful and fraudulent Misrepresentations in an amount to be determined at trial.

**Defendant's Violation of the Prepetition Injunction and Contempt**

30.

In the year or so prior to Plaintiff's termination, the Shareholders had each received an annual salary of approximately $75,000.00, plus approximately $9,000.00 per month ($108,000.00 annually) as a distribution from the Company's net profits.

31.

The Company, as directed by, and under the control of the Debtors, and the Debtors failed to pay Plaintiff his share of the Company's net profits following his termination.

32.

On May 28, 2015, the Cobb County court held an evidentiary hearing (the "***May 2015 Hearing***") as to whether, *inter alia*, Plaintiff was entitled to the appointment of a receiver for the Company.   At or around the time of the May 2015 Hearing, it became apparent to the Debtors, including Defendant, that the Company would potentially owe Plaintiff back distributions for the months since he had been terminated.

33.

At the May 2015 Hearing, Mr. Boughter testified under oath that none of the Shareholders had increased their compensation since Plaintiff had been terminated. Additionally, Mr. Boughter testified that no distributions were made to any of the Shareholders after September 2, 2014.  Both of Mr. Boughter's statements were materially false as set forth below. However, none of the Debtors, including Defendant, took any action to correct or supplement either of these representations to the Cobb County Court, even though they knew that both representations were false.  Based upon this false testimony, the Cobb County court declined to order the appointment of a receiver for the Company.

34.

The Debtors also opposed the appointment of a receiver for Firm Tech in sworn affidavit testimony, alleging that there was no financial or other factual basis for doing so.

35.

On June 11, 2015, following the May 2015 Hearing, at which all parties had a full and fair opportunity to be heard, the Cobb County court did issue an injunction (the "***Injunction***"). In the Injunction, the Cobb County court ordered that the Company be operated in the ordinary course of business.  Additionally, the Debtors were restricted from making any disbursements of corporate assets unless such disbursements were made equally to all four Shareholders.  A true and correct copy of the Injunction is attached as Exhibit "B".

36.

After entry of the Injunction, Plaintiff did not receive any disbursements or distributions from the Company.

37.

Once Plaintiff obtained Company financials and Quickbooks records following the May 2015 Hearing, he was able to determine that the Debtors had in fact increased their salaries around the time of Plaintiff's termination. Specifically, the Debtors increased their salaries starting in the third quarter of 2014, or around the time that Plaintiff was terminated.

38.

These increases in salary were made at a time when each of the Debtors, including Defendant, knew that the Company and the Debtors were obligated to pay Plaintiff the value of his shares under the Agreement. Additionally, these increases in salaries were made at a time when the Debtors' testified the revenues of the Company were declining.

39.

Rather than continue giving themselves $9,000.00 each per month as a distribution (which would have required the Debtors to commensurately issue a $4,500.00 bi-monthly distribution to Plaintiff), the Company, as directed by, and under the control of the Debtors, simply wrote checks to the Debtors in the amount of $4,500 bi-monthly with a notation of "payroll" or "salary" written in the memo line.

40.

The Debtors did not run these additional salary checks written in 2014 through the Company's payroll until on or about December 31, 2014. Accordingly, upon information and belief, the additional $9,000.00 per month the Debtors were taking as salary in 2014 rather than as distributions was not timely reported on the Debtors quarterly Georgia Quarterly Tax and Wage reports for 2014 or the Federal Form 941.

- 11 -

41.

From January 2015 through May 2015, the Debtors, as directed by, and under the control of the Debtors, and the Company continued to issue each of the Debtors checks for $4,500.00 bi-monthly, which were run through the Company's payroll.  During this time period, distributions were not recorded in the Company's Quickbooks records.

42.

Following the May 2015 Hearing, the Debtors took different measures to mask the profits they were taking out of the Company.  Namely, beginning with the Company's June payroll, the Debtors increased their compensation such that their total net take home pay, after taxes, would be the same as it has been prior to the May 2015 Hearing.  Thus, the Debtors effectively increased their salaries directly following the May 2015 Hearing.  This was done solely to "work around" the Injunction so that the Debtors did not have to share of the Company's profits with Plaintiff.

43.

The Debtors, including Defendant, failed to disclose to the Cobb County Court that they had taken the above-described increases in salary upon Plaintiff's termination.  Mr. Boughter also gave false testimony to the Court about this fact at the May 2015 Hearing.

44.

The Debtors and the Company, as directed by, and under the control of the Debtors, conspired to take clandestine and fraudulent measures to hide the fact that they had increased their salaries following Plaintiff's termination.  For example, rather than book the supplemental salary checks as salary in Quickbooks, the Debtors hid the salary checks in a portion of

- 12 -

Quickbooks where they had not been booked before and in illogical places.  This was done so that Plaintiff and others would not easily discover these salary increases paid to the Debtors.

45.

The Debtors and the Company, as directed by, and under the control of the Debtors, conspired to mask the income they were taking out of the Company as salary, solely in order to avoid paying Plaintiff his share of Company profits.

46.

Plaintiff believed, based upon the Debtors' false representations and deceitful actions to hide the fact that they were taking income out of the Company, that the Company was not imminently being financially harmed.  It was not until Plaintiff discovered the conspiracy of the Debtors and the Company, as directed by, and under the control of the Debtors, to hide these facts (after the Cobb County court ordered financials turned over to Plaintiff and he and his counsel had an opportunity to review them) that Plaintiff was able to seek Court intervention. Plaintiff filed a Petition for Citation of Contempt in September 2015 (the "***Petition for Contempt***") once he became aware of what was occurring.  This was approximately one year after he had been terminated.  By this point, the Debtors had fraudulently distributed Company income for an entire year, without compensating Plaintiff commensurately and in violation of the spirit of the Injunction.

47.

The Debtors also took profits out of the Company under the guise of reimbursing themselves for company expenditures, when no advances on behalf of the Company were made.

- 13 -

**The Squandering of Firm Tech and the Creation of Strategic Integration Partners**

48.

On November 19, 2015, the Cobb County court conducted a hearing (the "*November 2015 Hearing*") on the Petition for Contempt where Plaintiff sought an order against the Debtors holding them in civil contempt for violating the terms and spirit of the Injunction by (i) paying themselves distributions disguised as salary and (ii) providing false and perjurious testimony regarding the payment of distributions and increases in salary, which the Cobb County court had relied upon in executing the limited Injunction.

49.

During the course of the November 2015 Hearing, after a full evidentiary hearing wherein all parties to the action had an opportunity to be heard, Judge Reuben Green made pronouncements from the bench that Defendants were in contempt of Court, that a receiver for the Company would be appointed, and that attorneys' fees would be awarded to Plaintiff.

50.

Immediately following the pronouncements at the November 2015 Hearing, the Debtors starting plotting to place the Company and themselves into bankruptcy in order to stave off adverse judgment against them by the Cobb County court.   This was even after the Defendants had given sworn affidavit testimony in the Cobb County Litigation that there was "no basis" to dissolve Firm Tech.

51.

On November 30, 2015, the Debtors shut down the Company and placed it in chapter 7 bankruptcy.  Mr. Boughter also filed on this day.  Defendant and Mr. Jordan filed two days later on December 2, 2016.

- 14 -

52.

Plaintiff contends the Company was placed into chapter 7 bankruptcy solely to avoid an adverse judgment rendered in favor of Plaintiff.

53.

Similarly, Defendant filed bankruptcy individually solely to avoid an adverse judgment against him rendered in favor of Plaintiff.

54.

By placing the Company in chapter 7, Firm Tech was deprived of its going concern value, resulting in harm to Firm Tech's creditors, including Plaintiff, and various other parties in interest.

55.

In between the November 2015 Hearing and not later than December 1, 2016, the Debtors then began to plot the formation of a successor company that would carry out substantially the same line of business as Firm Tech.

56.

Specifically, during this time frame the Debtors conspired to create a competing company called Strategic Integration Partners, LLC ("**SIP**"), an IT outsourcing firm for professional practices, such as law firms.

57.

Around the time that the Debtors, including Defendant, placed the Company in bankruptcy and formed SIP, upon information and belief, the Debtors took active measures to move, hide, or destroy various customer contracts and managed service agreements (the "***Firm Tech Contracts***") that had previously been stored on the Firm Tech network.

- 15 -

58.

Additionally, the Debtors, including Defendant, conspired with one another to conceal or fail to disclose the location of the Firm Tech Contracts in connection with the Firm Tech Bankruptcy Case.  No executory contracts were disclosed in Firm Tech's bankruptcy schedules, even though Firm Tech was a party to various managed service agreements and other periodic contracts with customers as of its petition date.  The Debtors, including Defendant, used, at least in part, these contracts to persuade Firm Tech customers to become customers of SIP.

59.

Upon information and belief, the Firm Tech Contracts were either moved to SIP's network, and/or were utilized by SIP to create duplicate copies under SIP's new logo.  SIP did not compensate Firm Tech for the use of its intellectual property.

60.

The Debtors, including Defendant, took these actions with respect to the Firm Tech Contracts in order to bolster their new business venture, SIP, to the detriment of Firm Tech.

61.

SIP is in the business of providing labor and IT support services for law firms and other professional businesses, exactly as Firm Tech did.  SIP also sells hardware like Firm Tech did, even though the Debtors have contended that SIP merely coordinates sales of hardware to its clients on an as-needed basis.

62.

The Debtors did not put up any capital to start SIP.  Instead, the Debtors, including Defendant, utilized various intangible assets of Firm Tech to get their new business venture started, without compensating Firm Tech for such uses.

- 16 -

63.

As of its inception, SIP's customer base was primarily comprised of former Firm Tech clients.

64.

On December 1, 2016, only <u>one day</u> after Firm Tech filed bankruptcy, a domain name registration was created for SIP.   Upon information and belief, the website domain was registered by Eric Jordan.

65.

SIP, which is owned by Defendant, was formally organized in Georgia on December 8, 2015.  However, the Debtors began informally operating SIP as early as December 1, 2015 or earlier, and upon information and belief, were making plans to operate a competing company before Firm Tech was even placed into bankruptcy and as early as November 25, 2015, the date of the November 2015 Hearing.

66.

Debtor Jordan registered the website domain for SIP on December 1, 2016.  A true and correct copy of SIP's domain registration is attached as <u>Exhibit "C"</u>.

67.

The Defendant testified during his first meeting of creditors pursuant to 11 U.S.C. § 341 (a "***341 Meeting***") that no contact was made with SIP clients on behalf of SIP before SIP was formed on December 8, 2015.  He also testified that he was an independent contractor before SIP was formally organized, and that his communications with former Firm Tech clients before SIP was formed was to tell them he was only considering forming a new entity.

- 17 -

68.

However, the Debtors, including Defendant, upon information and belief, actively contacted existing Firm Tech clients to tell them about their new business venture around the time that Firm Tech was placed into bankruptcy, thereby stripping Firm Tech of valuable revenue opportunity.

69.

The Defendant also contacted former Firm Tech clients (and new SIP clients) on December 1, 2015 and December 2, 2015 to inform them about SIP.

70.

As of May 2016, more than forty-five of SIP's clients were former clients of Firm Tech. Most of these are law firms.

71.

The majority of SIP's current employees were formerly either employees or shareholders of Firm Tech. These employees were parties to non-competition agreements with Firm Tech as of Firm Tech's petition date.

72.

The Debtors, on SIP's behalf, sent out an entire "invoice run" on December 1, 2015 (before SIP was even formally organized on December 8, and just a day after Firm Tech filed bankruptcy), billing former Firm Tech clients for services to be rendered by SIP and hardware that had been ordered by Firm Tech on behalf of Firm Tech clients. Additional invoices were sent to former Firm Tech clients by SIP between December 7 and December 11.

73.

Upon information and belief, the Debtors, including Defendant, also caused former Firm Tech clients to pay SIP, rather than Firm Tech, for services rendered by Firm Tech. The Debtors, including Defendant, offered former Firm Tech clients discounts.

74.

The Debtors, including Defendant, also took quotes that had been prepared by Firm Tech and used them to "land business" on behalf of SIP.

75.

SIP also entered into a Master Services Agreement with a former Firm Tech client on December 1, 2015, making it very likely that one or more of the Debtors spoke with this particular (large) client before Firm Tech even filed bankruptcy, taking business away from Firm Tech.

76.

SIP is also currently using Firm Tech's proprietary materials, such as its contracts and other intellectual property without (i) previously disclosing to the Firm Tech Trustee such use or (ii) compensating the Firm Tech estate for such use.

**COUNT ONE**
**OBJECTION TO DISCHARGEABILITY OF**
**MATTHEW WADSWORTH'S INDIVIDUAL CLAIM**
**PURSUANT TO SECTION 523(a)(2)(A)**

77.

Plaintiff incorporates the allegations in Paragraphs 1 through 76 above as if fully herein restated.

- 19 -

78.

Plaintiff, in his individual capacity, was a creditor of Defendant prepetition.

79.

Prepetition, Defendant obtained money and property from Plaintiff in his individual capacity.

80.

Prepetition, Defendant conspired with the other Debtors and the Company, as directed by, and under the control of the Debtors, to deprive Plaintiff, in his individual capacity, of money and property that legally belonged to Plaintiff.

81.

The money and property that Defendant obtained from Plaintiff, in his individual capacity, was obtained by false pretenses, false representations, constructive fraud, and/or actual fraud.

82.

The Defendant, in conspiracy with the other Debtors and the Company, as directed by, and under the control of the Debtors, used false pretenses, false representations, and constructive and actual fraud to prevent Plaintiff, in his individual capacity, from obtaining the value of his shares.

83.

The Defendant paid himself and/or authorized distributions from the Company disguised as salary in order to avoid paying Plaintiff, in his individual capacity, his commensurate share of Company profits.

84.

The Defendant paid himself and/or authorized distributions from the Company disguised as expense reimbursements in order to avoid paying Plaintiff, in his individual capacity, his commensurate share of Company profits.

85.

Defendant increased his salary following Plaintiff's termination.    However, the Defendant failed to disclose that Mr. Boughter gave false testimony to the Cobb County court about the Defendant's increase in salary following Plaintiff's termination.

86.

Defendant permitted checks drawn on the Company's operating account to be paid to him with "payroll" or "salary" written on the memo line, even though such checks were not run through payroll.

87.

In 2014, Defendant conspired with the Company, as directed by, and under the control of the Debtors, to fail to report to the State of Georgia and the US Treasury the additional salary Defendant and the other Debtors were taking.

88.

The Defendant conspired with the other Debtors and the Company, as directed by, and under the control of the Debtors, to fail to record in Company records distributions made to Defendant in 2014 and 2015.

89.

The Defendant conspired with the other Debtors and the Company, as directed by, and under the control of the Debtors, to "work around" the Injunction so that they did not have to

share any Company profits with Plaintiff, in his individual capacity, as ordered by the Cobb County court.

90.

The Defendant conspired with the other Debtors and the Company, as directed by, and under the control of the Debtors, to hide the distributions he took disguised as salary by booking these payments in illogical places in Quickbooks.  This was done so that Plaintiff would not discover the additional salary that Defendant was taking when he received a copy of the Company's Quickbooks file.

91.

The Defendant knew or should have known that the above-described actions were perpetrating a fraud to the detriment of Plaintiff, in his individual capacity.

92.

These fraudulent actions resulted in the Company's financial health being negatively impacted, leaving no profits left over to distribute to Plaintiff equally with the other Debtors, as required by law and the Agreement.

93.

Plaintiff reasonably and detrimentally relied on the Company records as "doctored" by Defendant in conspiracy with the other Debtors and the Company, as directed by, and under the control of the Debtors, in exercising his rights and remedies under the Agreement and as a creditor and shareholder under Georgia law.

94.

Defendant, in conspiracy with the other Debtors and the Company, as directed by, and under the control of the Debtors, systematically conspired to defraud Plaintiff, in his individual

capacity, of his rights as a shareholder and conspired to defraud him out of receiving his share of Company profits.

95.

As a result of the Defendant's actions, Plaintiff, in his individual capacity, has suffered monetary damages in an amount to be determined by the trier of fact.

96.

Therefore, Plaintiff's claim against the Defendant is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A).

**COUNT TWO**
**OBJECTION TO DISCHARGEABILITY OF**
**PLAINTIFF'S CLAIM  ON BEHALF OF THE FIRM TECH ESTATE**
**PURSUANT TO SECTION 523(a)(2)(A)**

97.

Plaintiff incorporates the allegations in Paragraphs 1 through 96 above as if fully herein restated.

98.

Firm Tech was a creditor of Defendant prepetition.

99.

Prepetition, Defendant obtained money and property from Firm Tech.

100.

Prepetition, Defendant conspired with the other Debtors and the Company, as directed by, and under the control of the Debtors, to deprive the Firm Tech of money and property.

101.

The money and property that Defendant obtained from Firm Tech was obtained by false pretenses, false representations, constructive fraud, and/or actual fraud.

- 23 -

102.

The Defendant, in conspiracy with the other Debtors and the Company, as directed by, and under the control of the Debtors, used false pretenses, false representations, and constructive and actual fraud to deprive Firm Tech of value.

103.

The Defendant paid himself and/or authorized distributions from the Company disguised as salary in order to deprive Firm Tech of value.

104.

The Defendant paid himself and/or authorized distributions from the Company disguised as expense reimbursements in order to deprive Firm Tech of value.

105.

Defendant increased his salary following Plaintiff's termination.    However, the Defendant failed to disclose that Mr. Boughter gave false testimony to the Cobb County court about the Defendant's increase in salary following Plaintiff's termination.

106.

Defendant permitted checks drawn on the Company's operating account to be paid to him with "payroll" or "salary" written on the memo line, even though such checks were not run through payroll.  The Debtors, including Defendant failed to timely report this additional income to the appropriate taxing authorities.

107.

In 2014, Defendant conspired with the Company, as directed by, and under the control of the Debtors, to fail to report to the State of Georgia and the US Treasury the additional salary Defendant and the other Debtors were taking.

- 24 -

108.

The Defendant conspired with the other Debtors and the Company, as directed by, and under the control of the Debtors, to fail to record in Company records distributions made to Defendant in 2014 and 2015.

109.

The Defendant conspired with the other Debtors and the Company, as directed by, and under the control of the Debtors, to "work around" the Injunction so that they could deprive Firm Tech of value.

110.

The Defendant conspired with the other Debtors and the Company, as directed by, and under the control of the Debtors, to hide the distributions he took disguised as salary by booking these payments in illogical places in Quickbooks.  This was done so that Plaintiff would not discover the additional salary that Defendant was taking when he received a copy of the Company's Quickbooks file.

111.

The Defendant knew or should have known that the above-described actions were perpetrating a fraud to the detriment of Firm Tech.

112.

These fraudulent actions resulted in the Company's financial health being negatively impacted.

113.

Firm Tech reasonably and detrimentally relied on the Company records as "doctored" by Defendant in conspiracy with the other Debtors and the Company, as directed by, and under the control of the Debtors, in reporting its financial health.

114.

As a result of the Defendant's actions, Firm Tech and the Firm Tech Estate have suffered monetary damages in an amount to be determined by the trier of fact.

115.

Therefore, Plaintiff's claim on behalf of the Firm Tech Estate against the Defendant is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A).

## COUNT THREE
## OBJECTION TO DISCHARGEABILITY OF
## MATTHEW WADSWORTH'S INDIVIDUAL CLAIM
## PURSUANT TO SECTION 523(a)(2)(B)

116.

Plaintiff incorporates the allegations in Paragraphs 1 through 115 above as if fully herein restated.

117.

Plaintiff, in his individual capacity, is a creditor of Defendant.

118.

Defendant conspired with the other Debtors to provide HDH with various Misrepresentations in writing as to the financial condition of the Company.

119.

The Misrepresentations were materially false.

- 26 -

120.

The Misrepresentations respected the Company's financial condition.

121.

The Company is an insider of the Defendant.

122.

Plaintiff reasonably relied upon the materially false and omitted information supplied by Defendant in conspiracy with the other Debtors when Plaintiff agreed not to interfere with the Debtors' decision to retain HDH, rather than take action to prevent HDH from completing its valuation or otherwise exercise his rights under the Agreement.

123.

Plaintiff and HDH also reasonably relied upon the materially false and omitted information supplied by Defendant in conspiracy with the other Debtors in assessing the value of his shares in the Company.

124.

The Defendant, in conspiracy with the other Debtors, intended to deceive HDH and Plaintiff, in his individual capacity, when he provided the Misrepresentations to HDH.

125.

As a result of the Defendant's actions, Plaintiff, in his individual capacity, has suffered monetary damages in an amount to be determined by the trier of fact.

126.

Therefore, Plaintiff's claim against the Defendant is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(B).

<u>**COUNT FOUR**</u>
**OBJECTION TO DISCHARGEABILITY OF**
<u>**PLAINTIFF'S CLAIM ON BEHALF OF THE FIRM TECH ESTATE**</u>
<u>**PURSUANT TO SECTION 523(a)(2)(B)**</u>

127.

Plaintiff incorporates the allegations in Paragraphs 1 through 126 above as if fully herein restated.

128.

Firm Tech is a creditor of Defendant.

129.

Defendant conspired with the other Debtors to provide HDH with various Misrepresentations in writing as to the financial condition of the Company.

130.

The Misrepresentations were materially false.

131.

The Misrepresentations respected the Company's financial condition.

132.

The Company is an insider of the Defendant.

133.

Plaintiff reasonably relied upon the materially false and omitted information supplied by Defendant in conspiracy with the other Debtors when Plaintiff agreed not to interfere with the Debtors' decision to retain HDH, rather than take action to prevent HDH from completing its valuation or otherwise exercise his rights under the Agreement.

134.

HDH easonably relied upon the materially false and omitted information supplied by Defendant in conspiracy with the other Debtors in assessing the value of the Company.

135.

The Defendant, in conspiracy with the other Debtors, intended to deceive when he provided the Misrepresentations to HDH.

136.

As a result of the Defendant's actions, the Firm Tech Estate has suffered monetary damages in an amount to be determined by the trier of fact.

137.

Therefore, Plaintiff's claim against the Defendant on behalf of the Firm Tech Estate is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(B).

## COUNT FIVE
## OBJECTION TO DISCHARGEABILITY OF CLAIMS
## PURSUANT TO SECTION 523(a)(4)

138.

Plaintiff incorporates the allegations in Paragraphs 1 through 137 above as if fully herein restated.

139.

The Defendant was and is an officer and a director of the Company.

140.

The Defendant had fiduciary obligations to the Company and its shareholders.

141.

The Defendant also had fiduciary obligations to the Company's creditors.

142.

The Defendant committed fraud and/or defalcation, as alleged above, while acting in a fiduciary capacity.

143.

Alternatively, the Defendant obtained money from Plaintiff and the Company by embezzlement or larceny through systematically hiding from Plaintiff monies that took out of the Company.

144.

The Defendant committed fraud and/or defalcation while acting in a fiduciary capacity when he, in conspiracy with the other Debtors, caused the Company to fund the Debtors' defense in the Cobb County Litigation.

145.

The Defendant committed fraud and/or defalcation while acting in a fiduciary capacity when he squandered Firm Tech's going concern value to benefit himself individually and solely to avoid an adverse judgment being entered against him in favor of Plaintiff in the Cobb County Litigation.

146.

The Defendant committed fraud and/or defalcation while acting in a fiduciary capacity when he conspired with the other Debtors to create SIP, solely for the purpose of taking clients and business opportunities from Firm Tech.

- 30 -

147.

The Defendant committed fraud and/or defalcation while acting in a fiduciary capacity when he conspired with the other Debtors to seek payments from customers of Firm Tech under the guise of collecting receivables on behalf of himself or SIP, which had not yet been incorporated.

148.

As a result of the Defendant's actions, Plaintiff and Firm Tech have each suffered monetary damages in an amount to be determined by the trier of fact.

149.

Additionally, the actions of Defendant resulted in the lost value of the Company for all creditors and shareholders in an amount to be determined by the trier of fact.

150.

Therefore, Plaintiff's and Firm Tech's respective claims against the Defendant are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4).

### COUNT SIX
### OBJECTION TO DISCHARGEABILITY OF CLAIMS
### PURSUANT TO SECTION 523(a)(6)

151.

Plaintiff incorporates the allegations in Paragraphs 1 through 150 above as if fully herein restated.

152.

The Defendant willfully and maliciously injured Plaintiff, Firm Tech, and each of their respective interests, in property when he participated in the fraudulent actions described above, including but not limited to, providing HDH with false information about the financial condition

- 31 -

of the Company, masking distributions of Company profits disguised as salary to himself without making equal distributions to Plaintiff, and violating the Injunction.

153.

As a result of the Defendant's actions, Plaintiff and Firm Tech have each suffered monetary damages in an amount to be determined by the trier of fact.

154.

Additionally, the actions of Defendant resulted in the lost value of the Company for all creditors and shareholders in an amount to be determined by the trier of fact.

155.

Therefore, Plaintiff's and Firm Tech's respective claims against the Defendant are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(6).

**COUNT SEVEN**
**OBJECTION TO DISCHARGE**
**PURSUANT TO SECTIONS 727(a)(2)(A), 727(a)(3), and 727(a)(7)**

156.

Plaintiff, on behalf of himself and the Firm Tech Estate, incorporates the allegations in Paragraphs 1 through 155 above as if fully herein restated.

157.

The Defendant was, and is, an insider of Debtor Firm Tech, Inc., which is in bankruptcy in this District.

158.

The Defendant, with intent to hinder, delay, or defraud Plaintiff, Firm Tech, the Firm Tech Estate, and/or the Firm Tech Trustee, has transferred, removed, destroyed, or concealed, or has permitted to be transferred, removed, destroyed or concealed property of Firm Tech or within

- 32 -

one year before the Firm Tech petition date and on or within one year before his Petition Date in violation of 11 U.S.C. §727(a)(2)(A) and 11 U.S.C. § 727(a)(7).

159.

The Defendant, with intent to hinder, delay, or defraud Plaintiff, Firm Tech, the Firm Tech Estate, and/or the Firm Tech Trustee, has transferred, removed, destroyed, or concealed, or has permitted to be transferred, removed, destroyed or concealed property of Firm Tech after the Firm Tech petition date, and or within one year before Defendant's Petition Date, or during case, in violation of 11 U.S.C. §727(a)(2)(B) and 11 U.S.C. § 727(a)(7).

160.

Additionally, the Defendant has concealed, destroyed, falsified, or failed to keep or preserve information from which Firm Tech's business transactions might be ascertained in violation of 11 U.S.C. §727(a)(3) and 11 U.S.C. § 727(a)(7).

161.

The Defendant, with intent to hinder, delay, or defraud Plaintiff, Firm Tech, the Firm Tech Estate, and/or the Firm Tech Trustee, placed Firm Tech into bankruptcy and began operating a competing company, SIP, the very next day.  Pursuant to this process, assets of Firm Tech were diverted for the benefit of SIP and Defendant.

162.

SIP is in the same line of business as Firm Tech was, has many of the same clients, and is run by the same people that ran Firm Tech.

163.

The Defendant, in conspiracy with the other Debtors, began actively contacting Firm Tech clients to tell them about their new business venture around the time Firm Tech was placed

- 33 -

into bankruptcy.  This resulted in property of Firm Tech, i.e., client lists, revenue, and potential

review, being diverted from the Firm Tech Estate for the benefit of SIP and the Defendant.

164.

Additionally, the Defendant, in conspiracy with the other Debtors, took active measures

to hide or remove the Firm Tech Contracts from the Firm Tech network either right before or

after Firm Tech filed bankruptcy.

165.

SIP, with the assistance of Defendants and the other Debtors, utilized the Firm Tech

Contracts to create its own contracts.  Firm Tech was not compensated for SIP's use of these

proprietary materials.

166.

Therefore, the Debtor should be denied a discharge pursuant to section 727(a)(2),

727(a)(3) and 727(a)(7).

**COUNT EIGHT**
**OBJECTION TO DISCHARGEABILITY**
**PURSUANT TO SECTIONS 727(a)(4) and 727(a)(7)**

167.

Plaintiff, on behalf of himself and the Firm Tech Estate, incorporates the allegations in

Paragraphs 1 through 166 above as if fully herein restated.

168.

The Defendant was, and is, an insider of the Debtor Firm Tech, Inc., which is in

bankruptcy in this District.

- 34 -

169.

Defendant knowingly and fraudulently, in connection with this bankruptcy case made various false oaths during his 341 Meeting.

170.

The Debtor did not give truthful testimony about when he began servicing clients on behalf of SIP or when SIP began doing business with Firm Tech/SIP clients.

171.

Therefore, the Debtor should be denied a discharge pursuant to 11 U.S.C. §§ 727(a)(4) and 727(a)(7).

**WHEREFORE**, Plaintiff R. Matthew Wadsworth, on behalf of himself and the Firm Tech Estate, requests that the Court (i) determine that his and Firm Tech's respective Claims against Debtor are non-dischargeable pursuant to sections 523(a)(2), section 523(a)(4), and section 523(a)(6) of the United States Bankruptcy Code, 11 U.S.C. 1001 *et seq*.; (ii) determine that the Debtor is not entitled to a discharge pursuant to sections 727(a)(2), 727(a)(3), 727(a)(4), and 727(a)(7) of the United States Bankruptcy Code, 11 U.S.C. 1001 *et seq*.; (iii) enter a judgment against the Debtor and in favor of Mr. Wadsworth in the amount of not less than $1,000,000.00, and in a specific amount to be determined by the trier of fact; (iv) enter a judgement against the Debtor and in favor of Mr. Wadsworth on behalf of the Firm Tech Estate in the amount of not less than $1,000,000.00, and in a specific amount to be determined by the trier of fact; and (v) award such other and further relief as may be just and proper.

Dated:  May 27, 2016.

**BRYAN CAVE LLP**

*/s/ Gwendolyn J. Godfrey*
Gwendolyn J. Godfrey (Ga. Bar No. 153004)
Gwendolyn.Godfrey@BryanCave.com
One Atlantic Center – Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3488
Telephone:  (404) 572-6600
Facsimile:  (404) 572-6999

*Counsel for R. Matthew Wadsworth*

## **VERIFICATION**

Personally appeared before me, the undersigned attesting officer, duly authorized by law to administer oaths, R. Matthew Wadsworth, who, after being duly sworn, stated as follows:

1.      I am competent to testify to the matters herein and I make the following statements based upon my personal knowledge.

2.      I have read the Verified Complaint and declare under penalty of perjury that the facts contained in that document are true and correct to the best of my knowledge.

This 27th day of May 2016.

_____
R. Matthew Wadsworth

## <u>CONDITIONAL JOINDER</u>

COMES NOW, Robert Trauner, in his official capacity as Trustee under Chapter 7 of the United States Bankruptcy Code of Firm Tech, Inc., by and through counsel, and, to the extent necessary and/or appropriate, does, on behalf of the Bankruptcy Estate of Firm Tech, Inc., join in the foregoing Complaint filed by R. Matthew Wadsworth, adopting and incorporating by reference all of the allegations and prayers for relief asserted against the Defendant, as they pertain to the claims of the Firm Tech Estate.

Respectfully submitted,

**RAGSDALE, BEALS, SEIGLER,
   PATTERSON & GRAY, LLP**

/s/ *Robert A. Bartlett*
Robert A. Bartlett (Ga. Bar No. 040550)
W. Russell Patterson, Jr. (Ga. Bar No. 566920)
229 Peachtree Street, NE - Suite 2400
Atlanta, GA 30303-1629
Telephone: (404) 588-0500
Facsimile:  (404) 523-6714
Email:  rbartlett@rbspg.com
          wrpjr@rbspg.com

*Attorneys for Robert Trauner, in his Official
Capacity as Trustee under Chapter 7 of the United
States Bankruptcy Code of Firm Tech, Inc.*

# EXHIBIT



## SHAREHOLDERS CROSS PURCHASE AGREEMENT

This Agreement, (the "Agreement") made this 31st day of May, 2013, by and between FIRM TECH, INC. (Firm Tech or the Corporation), a Georgia corporation, and Robert M. Wadsworth (Wadsworth), Eric D. Jordan (Jordan), David N. Boughter (Boughter), and Ernesto Negron (Negron), (a "Shareholder" individually or the "Shareholders" collectively). This Agreement replaces and supersedes that certain previous Shareholders Cross Purchase Agreement executed by the Shareholders, dated September 30, 2003, which, upon the execution of this Agreement, shall have no further force or effect.

## WITNESSETH:

WHEREAS, the Shareholders are presently the owners of all the outstanding capital stock of Firm Tech, in the amounts shown on Schedule A attached hereto; and

WHEREAS, each Shareholder is active in the management of the Corporation and contributes substantially to the success of the Corporation's business operations; and

WHEREAS, the Shareholders and the Corporation deem it to be in their best interest to restrict the transfer of the stock of the Corporation in such a manner as to provide for an orderly disposition of the stock of any Shareholder who dies or desires to transfer his or her stock.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

## ARTICLE 1
## VOLUNTARY RESTRICTIONS DURING LIFE

1.1    All Stock Covered: Each and every share of stock of the Corporation owned heretofore and hereafter acquired by any Shareholder (the "Stock") is and shall be held, owned and transferred subject to the terms and conditions contained herein.

1.2    Endorsement of Certificates: Upon the execution of this Agreement, the parties hereto shall cause the presently issued stock certificates of the Corporation and those to be issued in the future to be endorsed as follows:

> "NOTICE IS HEREBY GIVEN that the sale, assignment, pledge, transfer or other disposition of the shares of stock represented by this certificate are subject to a certain restrictive agreement among the Shareholders, a copy of which Agreement is on file in the office of the Secretary of the Corporation."

1.3    Transfer of Stock: A Shareholder shall not, except as provided in this Agreement,

sell, assign, or otherwise transfer or encumber in any manner any interest in all or any part of his or her Stock without prior written consent of the other Shareholders in accordance with the terms and conditions of this Agreement.

1.4    <u>Lifetime Transfers</u>: In the event a Shareholder shall, during his life, desire to transfer any portion or all of his Stock, whether by sale or gift, and shall not have received the prior written consent of the other parties to this Agreement, then he may transfer the Stock only after offering such Stock to the remaining Shareholders in the following manner:

(a)    The Shareholder desiring to transfer all or part of his Stock, (the "Offeror") shall serve written notice (the "Notice") upon all other Shareholders and the Corporation by certified mail stating the number of shares to be transferred, the names and addresses of the transferees and the purchase price and terms of payment of such transfer; the Notice shall also contain an offer to sell such Stock to the Shareholders, at the price upon the terms and conditions set forth in the Notice.

(b)    The Corporation may, within ten (10) days of the receipt of such Notice, elect in writing to purchase all of such Stock. Such purchase shall be effected in accordance with the provisions specified by the Offeror in the Notice. If the Corporation does not so elect, then a Shareholder may, at any time within thirty (30) days after receipt of the Notice, elect in writing to purchase that number of shares of Stock owned by the Offeror which is derived by applying to the total number of shares owned by the Offeror, a ratio equal to the ratio which the number of shares of Stock owned by such Shareholder bears to the total number of shares of Stock owned by all Shareholders, excluding the shares of Stock owned by the Offeror. In the event the Shareholder shall fail to exercise such option to purchase, then such unpurchased shares of Stock shall be offered to the remaining Shareholders. Each of the remaining Shareholders shall have thirty (30) days from the date of the Notice of such offer to elect in writing to purchase that number of such offered but unpurchased shares of Stock which is derived by applying to the total number of such offered and unpurchased shares, a ratio equal to the ratio which the number of shares owned by each remaining shareholder bears to the total number of shares of Stock owned by all Shareholders excluding the shares of Stock owned by both the Offeror and all Shareholders declining to purchase such offered shares. Subject to paragraph (c) of this Section 1.4 below, in the event of an election made pursuant to this section, the Offeror shall transfer all of the offered Stock, and the Shareholders shall purchase such Stock, within fifteen (15) days after receipt by the Offeror of the written exercise of the options to purchase. Such purchases shall be effected in accordance with the provisions specified by the Offeror in the Notice. The

closing of any purchase under this Agreement shall be held at the principal office of Firm Tech or at such other place as the parties may agree. The Offeror shall represent and warrant to the Corporation or Shareholders, as applicable, that he is conveying to them good and marketable title to such stock free and clear of any claims, options, charges, encumbrances or right of others, except as may be created by this Agreement.

(c)     In the event the Corporation or Shareholders shall fail to elect to purchase all of the offered Stock, then the Offeror shall be free to withdraw the offer and to transfer the Stock to the person or persons named in the Notice; provided, however, that in the event such transfer is not completed within ninety (90) days following the date of the Notice, no transfer of Stock shall be made without again giving the Notice and successive options required by Section 1.4. Any Stock sold, transferred, assigned, conveyed, donated or otherwise disposed of by the Offeror shall remain subject to all of the terms and conditions of this Agreement, and any purchaser, assignee, donee or transferee of such shares must first agree in writing to be bound by this Agreement as if a party hereto.

(d)     No Shareholder shall have the right to pledge, mortgage, hypothecate, convey, assign or otherwise encumber any shares of Stock for the purpose of securing any debt or other obligation without the prior approval of the Board of Directors of Firm Tech; provided, however, that each Shareholder shall have the right without such approval to pledge all or any part of the shares of Stock held by him to secure an obligation of Firm Tech, to secure an obligation of such Shareholder to Firm Tech or to secure an obligation of such Shareholder to another Shareholder. In the event of any pledge of Stock, the shares of Stock so pledged shall remain subject to the terms and conditions contained in this Agreement, which shall be prior and superior to any such pledge. The pledgee of such shares, and any assignee or transferee of such pledgee, shall take such shares subject to the terms and conditions of this Agreement.

## ARTICLE 2
## INVOLUNTARY TRANSFERS DURING LIFE

2.1     <u>Cessation of Employment</u>: If the employment of a Shareholder by the Corporation ceases due to retirement, resignation or a disability rendering him unable to perform his job functions for a period exceeding 90 days, the Shareholder shall be deemed to have given notice to the other Shareholders and the Corporation, as of the date the employment ceases or is terminated, offering to sell all of his Shares in accordance with the provisions of Articles 2 herein.

2.2     <u>Termination of Employment for Cause</u>: A Shareholder's employment by the

Corporation may only be terminated "For Cause," as defined herein. Such termination shall require the affirmative vote of a supermajority of the then current Shareholders in order to be effective. If a Shareholder's employment is so terminated, the Shareholder shall be deemed to have given notice to the other Shareholders and the Corporation, as of the date the employment is terminated, offering to sell all of his Shares in accordance with the provisions of Articles 2 herein.

For the purposes of this Agreement, "For Cause" shall mean any termination of the employment of a Shareholder for any of the following reasons:

(a)     The material breach of the Shareholder of any material obligation under this Agreement or any employment agreement between the Shareholder and the Corporation;

(b)     The noncompliance by the Shareholder with any material rule or policy of the Corporation;

(c)     The failure of the Shareholder, after written notice and an opportunity to cure, (1) satisfactorily perform job tasks assigned to Shareholder pursuant to any job description applicable to Shareholder as an employee of the Corporation, (2) accomplish material tasks or periodic goals applicable to the Shareholder which are set by the Corporation for the Shareholder as an employee of the Corporation, or (3) agree to any job description, assigned tasks or periodic goals proposed for the Shareholder as an employee by the Corporation when such job description, assigned tasks or periodic goals are approved in writing by at least seventy-five percent (75%) of the Shareholders.

(d)     The Shareholder's conviction of or pleading no contest to any criminal offense involving a felony, fraud, embezzlement or to other criminal offense involving financial impropriety.

(e)     Shareholder engages in any conduct that constitutes a material violation of any State or Federal laws, rules or regulations applicable to the conduct of the Corporation's business;

(f)     The actions of the Shareholder, including, but not limited to, drug or alcohol abuse, that Shareholder has not ceased after written notice and an opportunity to cure, which are likely to be harmful or detrimental to the business and/or reputation of the Corporation; and

(g)     Shareholder neglects or damages any property of the Corporation.

2.3    Divorce: If a Shareholder's shares are subject to transfer to such Shareholder's spouse pursuant to judicial order in any divorce proceeding, then such Shareholder shall be deemed to have given notice to the other Shareholders and the Corporation, as of the date of the judicial order, offering to sell all of his Shares in accordance with the provisions of Articles 2 herein.

## ARTICLE 3
## PURCHASE UPON DEATH

3.1    Purchase Upon Death: Upon the death of a Shareholder, (the "Deceased Shareholder"), if Firm Tech does not exercise its option pursuant to Article 3.2, the surviving Shareholders shall purchase from the estate of the Deceased Shareholder all of the Stock owned by the Deceased Shareholder at the time of his death. Each surviving Shareholder shall be required to purchase that number of shares of Stock owned by the Deceased Shareholder derived by applying to the total number of shares of Stock owned by the Deceased Shareholder, a ratio equal to the ratio which the number of shares owned by such surviving Shareholder bears to the total number of shares of Stock owned by all Shareholders, excluding the shares of Stock owned by the Deceased Shareholder, such purchases to take place within ninety (90) days following the issuance of letters testamentary or letters of administration to the executors or administrators of the estate of the Deceased Shareholder.

3.2    Corporation's Option: Within ninety (90) days following the issuance of letter testamentary or letter of administration to the executors or administrators of the estate of the Deceased Shareholder, Firm Tech may, at its option, elect to purchase all of the Shares owned by the Deceased Shareholder.

3.3    Purchase Price: The executors or administrators of the estate of the Deceased Shareholder shall transfer to the purchasing Shareholder or Firm Tech the number of shares of Stock purchased by such Shareholder or Firm Tech upon payment of the purchasing price computed and paid in accordance with the provisions of Articles 4 and 5, respectively.

## ARTICLE 4
## PURCHASE PRICE AND VALUATION OF STOCK

4.1    Purchase Price: For purposes of purchases of Shares pursuant to the provisions of this Agreement, the purchase price for each Share shall be the fair value of each Share as determined pursuant to this Article 4.

4.2    Certificate of Value: The parties hereto agree that the fair value of each Share shall be determined as follows:

(a)  As of the Effective Date of this Agreement, and for the remainder of the then current fiscal year, unless updated in accordance with the terms contained in subparagraph (c), below, the fair value for each share of stock of the Corporation shall be the amount set forth in Schedule B to this Agreement.

(b)  For each subsequent fiscal year of the Corporation, the fair value for each share of stock shall be established by the unanimous affirmative vote of the Shareholders within ninety (90) days following the end of the immediately preceding fiscal year. In the event the Shareholder's are unable to reach a unanimous agreement regarding valuation within the time specified, then the Corporation's CPA shall propose a valuation to the Shareholders, which, if unanimously approved by the Shareholders, shall become the valuation for that fiscal year. If the Shareholders are unable to unanimously approve the CPA's valuation, then the Corporation shall retain either an independent CPA or professional business appraiser to establish the valuation. Such independent valuation, when issued, shall become the valuation for such fiscal year, unless the Shareholders unanimously agree to reject such independent valuation and to replace it with the Shareholders own valuation. Such valuation shall remain in effect until the end of the fiscal year of the Corporation for which such valuation is made, unless updated in accordance with the terms contained in subparagraph (c), below.

(c)  At anytime during any given fiscal year the Shareholders may, by unanimous affirmative vote, update the valuation applicable to such fiscal year.

(d)  If any event should occur resulting in a right or obligation to purchase shares under Articles II or III of this Agreement, as specified in such Articles, then the Shareholders shall update the valuation applicable to the fiscal year in which such event occurred. The Shareholders shall update the valuation by using the same process described in subparagraph (b), above, but shall use the Corporation's earnings for the immediately preceding four (4) full financial quarters (Jan-Mar, Apr-Jun, Jul-Sep, or Oct-Dec, as applicable) as the basis for determining value.


## ARTICLE 5
## PAYMENT OF PURCHASE PRICE

5.1    Payment of Purchase Price: It is understood and agreed between the parties that the purchase price for any Stock purchased pursuant to Article 3 shall be paid as follows:

(a)    In the event the proceeds of any insurance policy or policies payable to any purchasing Shareholder or to Firm Tech as a result of an event causing a purchase hereunder are sufficient to pay their portion of the purchase

price, then such portion of the purchase price shall be paid to the selling Shareholder or his legal representative, in full payment for the purchased Stock within ten (10) days of receipt of such proceeds by the purchasing Shareholder or Firm Tech.

(b)     In the event that the proceeds of any insurance are less than such portion of the purchase price, the entire net insurance proceeds shall be paid to the selling Shareholder or his legal representative, as partial payment on account of such portion of the purchase price within ten (10) days of receipt by the purchasing Shareholder or Firm Tech of such proceeds.

(c)     In the event no insurance proceeds are received or the insurance proceeds are less than 10% of the purchase price, each purchasing Shareholder or Firm Tech shall pay the selling Shareholder or his legal representative, at Closing, an amount equal to the lesser of (i) 10% of the purchase price or (ii) 10% of the purchase price less insurance proceeds paid in accordance with Section 5.1(b).

(d)     At Closing, each purchasing Shareholder or Firm Tech shall execute and deliver to the selling Shareholder his promissory note equal in principal amount to the amount, if any, by which the aggregate purchase price for all of the Stock purchased exceeds any payments made to the selling Shareholder in accordance with Section 5.1(a) through 5.1(c).

(e)     Any promissory note delivered pursuant to Section 5.1(d) shall be payable in sixteen equal quarterly payments of principal and interest, commencing on the ninetieth (90th) day following the closing, shall be secured by the shares transferred pursuant to Article 3 and shall bear annually accruing interest at the One-Year LIBOR rate which is published in the Wall Street Journal the last full business day (Monday through Friday) occurring immediately prior to the date of Closing.

5.2     Closing: Any purchase of Stock shall take place at the principal office of the Corporation, unless otherwise mutually agreed, at 10:00 AM within the period for any mandatory purchase of such shares as herein provided or, if insurance proceeds are received within such period by a purchasing Shareholder as a result of the event causing a purchase, within the ten (10) days of the receipt of such proceeds.

ARTICLE 6
INSURANCE

6.1     Insurance: For purposes of this Agreement, Firm Tech or each Shareholder may purchase one or more life insurance policies on the life of every other

Shareholder, as set forth on Schedule C attached hereto. Each Shareholder or Firm Tech, as designated in the Schedule C, shall be the owner and beneficiary of each policy he has purchased on the life of each other Shareholder, and shall possess all rights with respect to such policies. The Shareholders and Firm Tech agree to timely pay all premiums due on each policy. If any Shareholder or Firm Tech shall fail to make any premium payment within twenty (20) days after its due date, then the Shareholder on whose life, or with respect to whom, the policy is issued may make such premium payment, and shall be reimbursed in full therefore by the owner of such policy, within ten (10) days of making such payment. In the event that a Shareholder's Stock is purchased pursuant to this Agreement for any reason other than death, or in the event that this Agreement shall terminate as hereinafter provided, then such Shareholder, or each Shareholder, as the case may be, shall have the right to purchase any life insurance policies on his life then owned by another Shareholder or Firm Tech, within thirty (30) days of such purchase of Stock or termination of this Agreement. Any Shareholder so electing shall give written notice thereof to each owner of such policy of such Shareholder's intent to purchase the same. The purchase price for any life insurance policy shall be the policy's interpolated terminal reserve, plus any dividend credits then outstanding, plus the proportionate part of any yearly premium previously paid but covering the period beyond the date of purchase of the policy, minus any policy indebtedness then outstanding. Upon purchase and transfer of any such policy as hereinafter provided, the Shareholder previously owning such policy shall cease to be liable for any further premium payments thereon. Any policy subject to this Article which is not purchased or assumed by a Shareholder within the applicable time period shall cease to be subject to this Agreement.

The Shareholders or Firm Tech may from time to time procure additional life insurance policies on the lives of each other Shareholder and may make such policies subject to this Agreement, in which case, such policies shall be added to Schedule C hereof. All Shareholders agree to cooperate fully by performing all the tasks required by the insurers which are necessary conditions precedent to the issuance of insurance policies, including but not limited to the provision of historical and physical information and submission to physical examinations.

## ARTICLE 7
## DRAG ALONG RIGHTS

7.1    Drag-Along Sale: If Shareholders owning at least seventy-five percent of the total issued and outstanding shares of stock in the Corporation ("Controlling Shareholders") collectively determine to transfer all or any portion of each of their respective shares to an independent third party ("Transferee") that is not a Shareholder or an affiliate of a Shareholder and (a) such transfer is a part of an Agreement that requires all Shareholders to transfer all or such portion of each of

their respective shares (a "Drag-Along Sale"), and (b) the price offered by the Transferee for the transfer of all issued and outstanding shares of stock in the Corporation is not less than eighty percent (80%) of the then current total value for all such shares of stock, determined in accordance with Article IV, hereunder, then such transfer shall be permitted under the terms of this Article 7, notwithstanding any terms and conditions to the contrary elsewhere in this Agreement. With respect to any Drag-Along Sale, the terms and conditions of this Article 7 shall be deemed controlling and determinative over any other terms and conditions contained elsewhere in this Agreement that may conflict with the terms contained in this Article 7.

7.2     Drag-Along Shareholder: In the event the Controlling Shareholders agree to a Drag-Along Sale, then upon the Controlling Shareholders' request, all other Shareholders ("Drag-Along Shareholders") shall transfer all or such portion of their shares of stock to the Transferee in amounts that are pro-rata with the Controlling Shareholders and upon the same terms and conditions as the Controlling Shareholders or upon terms and conditions that are no less favorable than the Controlling Shareholders. Each Drag-Along Shareholder shall be obligated to provide the same representations, warranties, covenants and indemnification to the Transferee in any such Drag-Along Sale as the Controlling Shareholders; provided that (a) no Drag-Along Shareholder shall be required to make representations and warranties or provide indemnification with respect to any other Shareholder's existence, authority, title to shares of stock or other similar matters relating to such Shareholder, (b) no Drag-Along Shareholder who is not an employee of the Corporation shall be required to enter into any non-competition or similar restrictive covenant, (c) each Drag-Along Shareholder's liability for indemnification shall be several, not joint and several, and (d) no Drag-Along Shareholder's indemnification obligation shall exceed the net proceeds received by such Drag-Along Shareholder for his/her shares of stock transferred to Transferee pursuant to the Drag-Along Sale.

7.3     Notice and Sale: Prior to consummating any Drag-Along Sale, the Controlling Shareholders shall, if they determine that the Drag-Along Shareholders should participate in the Drag-Along Sale, provide each such Drag-Along Shareholder with written notice (the "Drag-Along Notice") not less than ten (10) Business Days prior to the proposed date of the Drag-Along Sale (the "Drag-Along Sale Date"). The Drag-Along Notice shall set forth (i) the name of the proposed purchaser, (ii) the proposed amount and form of consideration to be paid per share of stock and the material terms and conditions of the Drag-Along Sale, and (iii) the Drag-Along Sale Date and the date upon which the Drag-Along Shareholders shall deliver to the Controlling Shareholders the certificates or instruments representing the shares of stock owned by the Drag-Along Shareholders, duly endorsed, together with any consents, waivers or other instruments required pursuant to the terms of the Drag-Along Sale. Accompanying such notice shall be

copies of all written documentation available to the Controlling Shareholders describing the terms of the proposed Drag-Along Sale, including, but not limited to, any letter of intent to purchase, any proposed purchase agreement, and any other document which describes the rights and obligations of the Shareholders with respect to the Drag-Along Sale, whether such rights and obligations arise before, during or after the Drag-Along Sale.

Following receipt of the foregoing Notice and documentation, each such Drag-Along Shareholder shall deliver to the Controlling Shareholders the certificate(s) or instrument(s) (if any) representing their shares of stock, duly endorsed for transfer with signatures guaranteed, on or before the date set forth in the Drag-Along Notice for such delivery, and shall execute any purchase agreement or other documentation required to consummate such Drag-Along Sale, subject to any limitations on the terms thereof set forth in this Article 7. If a Drag-Along Shareholder receives the applicable purchase price from a Drag-Along Sale, but has failed to deliver certificates or instruments (if any) representing its shares of stock as described herein, it shall for all purposes be deemed no longer to be a shareholder of the Corporation with respect to the shares of stock for which the purchase price has been received, and with respect to such shares of stock shall have no voting rights, shall not be entitled to any dividends or other distributions and shall have no other rights or privileges granted to shareholders under law or this Agreement.

7.3    Merger or Reorganization: If a Drag-Along Sale is to be effected in the form of a merger or other reorganization which requires approval of the Shareholders, and if the Controlling Shareholders approves the Drag-Along Sale (an "Approved Sale"), the Drag-Along Shareholders shall vote for, consent to and raise no objections against such Approved Sale, and each Drag-Along Shareholder shall waive any dissenters' rights, appraisal rights or similar rights in connection with such Approved Sale. Each Drag-Along Shareholders shall take all necessary or desirable actions in connection with the consummation of the Approved Sale and the distribution of the aggregate consideration from such Approved Sale as reasonably requested by the Corporation.

## ARTICLE 8
## NUMBER AND ELECTION OF DIRECTORS

8.1    Number of Directors and Mandatory Voting Requirements: Beginning on the date of execution of this Agreement, each shareholder owning ten percent (10%) or more of the issued and outstanding shares of the Corporation ("Major Shareholder") shall have the right to designate one person to be elected to the Board of Directors. Further, such Major Shareholders each agree to vote all of their shares of Stock at any meeting of the shareholders of Firm Tech at which directors are elected (an "Election Meeting") in the manner necessary to elect as

directors of the Corporation the persons to be designated as provided in Sections 8.2 and 8.3 of this Agreement.

8.2     <u>Method of Designating Directors</u>: At least thirty (30) days before any Election Meeting (while the provisions of this Article 8 are in effect) each Major Shareholder shall notify the Corporation and each of the other Shareholders in writing of the name of the person to be designated by such Major Shareholder for election to the Board of Directors of the Corporation.

8.3     <u>Vacancies on Board</u>: If any director elected pursuant to this Article 8 ceases to be a director for any reason while the mandatory voting requirements provided for in Section 8.1 of this Agreement remain in effect, then the Major Shareholder who designated the director no longer serving shall have the right to designate a replacement director.

8.4     <u>Continuance of S-Election</u>: The Corporation has elected S-Corporation status for income tax purposes. The parties agree that they will do nothing, either directly or indirectly, which will cause or may have the effect of causing the termination of the S-Election. No party shall transfer or make any other disposition of his Stock which will or may terminate the S-Election and all parties will take any action that may be needed to continue the election from year to year and to prevent its termination.

## ARTICLE 9
## MISCELLANEOUS

9.1     <u>Dividends</u>: The parties agree that Firm Tech will make and the Board of Directors will authorize annual distributions to the Shareholders with a record date of December 31 in an amount equal to Firm Tech's federal taxable income for the year ended that December 31 multiplied by the sum of the highest federal and highest state income tax rates to which a shareholder is subject. This distribution shall be made by April 15 of the following year. The amount of the distribution shall be reduced by the amount of all other distributions with a record date prior to December 31 but with the same calendar year and which have been paid by the following April 15.

The parties agree that, if a Shareholder sells his Stock pursuant to Article 2 or Article 3, Firm Tech will make and the Board of Directors will authorize a distribution to the Shareholders with a record date one day previous to the closing of the sale in an amount equal to Firm Tech's federal taxable income for the period beginning the prior January 1 and ending on the record date less any distributions previously made with a record date within this period. This distribution shall be paid by April 15 of the following calendar year.

The parties agree that they will take any and all actions that may be required to carry out the provisions of this Article 9.1.

9.2    Issuance of Additional Common Stock: The Corporation agrees that it will not issue additional shares of Stock to any persons or entities who are not parties to this Agreement unless such persons agree in writing to be bound by the terms and conditions of this Agreement and unless the certificates representing such shares bear the legend set forth in Section 1.2 of this Agreement, with such additions and deletions as may be appropriate.

9.3    New Shareholders: After following the procedures set forth in this Agreement, any shares of Stock transferred by a Shareholder to a person or entity not presently a party to this Agreement shall remain subject to all of the terms, conditions and restrictions of this Agreement.

9.4    Specific Performance: The parties hereby declare that it is impossible to measure in money the damages that will accrue by reason of a failure of any person or entity to perform any of its obligations under this Agreement. Accordingly, in any action or proceeding to enforce the provisions of this Agreement, any person (including Firm Tech) against whom such action or proceeding is brought hereby waives the claim or defense therein that an adequate remedy exists at law, and such person shall not urge in any such action or proceeding the claim or defense that such remedy at law exists. The provisions of this Section 9.4, however, shall not prevent any party from seeking a remedy at law in connection with any breach of this Agreement.

9.5    Notices: Except as otherwise specifically provided in this Agreement, any and all notices, designations, consents, offers, acceptances, or any other communications provided for in this Agreement shall be given in writing by personal delivery or by registered or certified mail which shall be addressed, in the case of Firm Tech, to its principal office, and in the case of a Shareholder, to his residence address or such other address as may be designated by such person or shown on the stock transfer books of Firm Tech.

9.6    Severability of Provisions: If any one or more of the provisions of this Agreement shall be determined to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions of this Agreement shall not be impaired in any way.

9.7    Amendments: No change, amendment or modification of this Agreement shall be valid unless it is in writing and signed by all the parties to this Agreement.

9.8    Termination: This Agreement shall become effective immediately upon the

execution hereof by the last of the Shareholders to execute this Agreement, and shall terminate upon the first to occur of the following:

(a)     May 1, 2033;

(b)     the bankruptcy or insolvency of Firm Tech;

(c)     the effective date of a registration statement under the Securities Act of 1933, or any successor federal law, filed by the Corporation with the Securities Exchange Commission, or any successor in function, in connection with a bona fide underwritten, public offering of the Common Stock of Firm Tech.

The foregoing notwithstanding, the provisions of this Agreement shall terminate as of any Shareholder who or which has sold all of the shares of Stock owned by him or it in accordance with the provisions of this Agreement, and who or which is not then in default under this Agreement, as of the date of the closing of the last such sale of shares of Stock; provided, however, that if such Shareholder shall have the right to vote, or to direct the voting of, any shares of Stock after their sale, he or it shall nevertheless remain subject to the voting requirements of Article 7 of this Agreement until such time as he or it is no longer able to vote, or to direct the voting of, any of the shares of Stock or until the earlier occurrence of any of the events specified in clauses (a) through (c) of this Section 9.8.

9.9     <u>Waivers</u>: Nothing contained in this Agreement shall prevent the waiver of the provisions of this Agreement by the parties hereto. No party to this Agreement, however, shall be deemed to have waived any of its rights under this Agreement unless such waiver is in writing and signed by such party. A waiver on any one occasion shall not be construed as a bar to the exercise of, or waiver of, any right on any future occasion.

9.10    <u>Counterparts</u>: This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

9.11    <u>Benefit</u>: All of the terms, covenants, agreements and conditions contained in this Agreement shall be binding upon and inure to the benefit of all of the parties hereto, and their respective heirs, executors, administrators, legal representatives and successors.

9.12    <u>Governing Law</u>: This Agreement is made under, and shall be governed by and construed and enforced in accordance with the laws of the State of Georgia.

9.13    <u>Conflict with By-Laws</u>: In the event of any conflict between the terms and

provisions of this Agreement and the terms and provisions of the By-Laws of the Corporation, the terms and conditions of this Agreement shall control.

9.14   <u>Shareholder and Director Voting</u>: The number of votes required for the Shareholders and/or Directors to take or authorize any action at a meeting duly called and at which a quorum is present shall be determined as follows:

(a)   <u>Majority Vote</u>: Except as otherwise provided in this Agreement, the Corporation's bylaws, or as required by applicable law, a majority of the votes cast in a meeting shall be sufficient to take or authorize any action to be taken upon any matter which may properly come before the meeting. In the event of a deadlocked vote on any matter, each Shareholder and/or Director hereby agrees that the President of the Corporation, provided the President is also a Shareholder, shall have one additional vote with respect to such matter in order to break such deadlock and, for such purpose and such purpose alone, this Agreement shall be deemed a "voting agreement," subject to the terms of Section 14-2-731 of the Georgia Business Corporation Code.

(b)   <u>Supermajority Vote</u>: Except as otherwise provided in this Agreement, the Corporation's bylaws, or as required by applicable law, a supermajority vote, consisting of at least seventy-five percent (75%) of the issued and outstanding shares, in the case of shareholder meetings, or, in the case of directors meetings, at least seventy-five percent (75%) of the then current total directors, shall be required to take or authorize any of the following actions:

(1)   The issuance of any additional shares of the Corporation;

(2)   Any amendment to the Corporation's bylaws;

(3)   Any sale, transference or other disposition of all or substantially all of the Corporation's assets;

(4)   The conversion, merger or consolidation of the Corporation with or into any other person or entity; and

(5)   The dissolution of the Corporation.

(6)   The termination of employment of any Shareholder "For Cause," as defined in Section 2.2, above.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto set their hands and seals as of the day and year first above written.

SHAREHOLDERS

_____
Robert M. Wadsworth

_____
Eric D. Jordan

_____
David N. Boughter

_____
Ernesto Negron


Firm, Tech, Inc.

By _____
      President

Attest: _____
           Secretary

[Corporate Seal]

SHAREHOLDERS CROSS PURCHASE AGREEMENT

SCHEDULE "A"

| | |
|---|---|
| Robert M. Wadsworth | 1,000 shares |
| Eric D. Jordan | 1,000 shares |
| David N. Boughter | 1,000 shares |
| Ernesto Negron | 1,000 shares |

SHAREHOLDER CROSS PURCHASE AGREEMENT

SCHEDULE "B"

CERTIFICATE OF VALUE

We certify that the value of each share of stock of Firm Tech, Inc, for the purposes of Article 4, Section 4.2(a) of the Shareholders Cross Purchase Agreement ("Agreement") is $1,000 per share. This value shall be the purchase price per share.

Dated May 31, 2013

_____
Robert M. Wadsworth

_____
Eric D. Jordan

_____
David N. Boughter

_____
Ernesto Negron

SHAREHOLDER CROSS PURCHASE AGREEMENT

SCHEDULE "C"

INSURANCE

As of the date of execution of the Agreement, there are insurance policies held by the Corporation or the Shareholders on the lives of the Shareholders, as described in Article 6 of the Agreement, having an insured benefit amount of $1,000,000 for each shareholder.

# EXHIBIT

# B

COBB COUNTY, GA
FILED IN OFFICE

2015 JUN 11 PM 3: 52

COBB SUPERIOR COURT CLERK

## IN THE SUPERIOR COURT OF THE COUNTY OF COBB
## STATE OF GEORGIA

|  |  |
|---|---|
| FIRM TECH, INC., ) | |
| R. MATTHEW WADSWORTH, ) | |
| Individually and as a member of ) | |
| FIRM TECH, INC. & on its behalf, ) | |
|     Plaintiffs, ) | |
|                 ) | CIVIL ACTION FILE NO. |
|     Vs.          ) | |
|                 ) | 15-1-1818-51 |
| ERIC D. JORDAN, DAVID N., ) | |
| BOUGHTER, & ERNESTO T. ) | |
| NEGRON, as members of ) | |
| FIRM TECH, INC. ) | |
|     Defendants. ) | |

### INTERLOCUTORY INJUNCTION

**The above-styled matter having come on for hearing,** before the undersigned and the Court having heard and considered the testimony, documentary evidence and arguments of Counsel,

NOW THEREFORE, the Court hereby FINDS & ORDERS as follows:

1.

The Plaintiff's request for an interlocutory injunction is GRANTED based on the desire of the Court to preserve the status quo and to balance the relative conveniences of the parties pending the final adjudication of the matter. *University Health Services v. Long,* 274 Ga. 829, 561 S.E.2d 77 (2002).

2.

The Defendants, as members of Firm Tech, Inc., shall be restrained and enjoined as follows:

a) Defendants shall continue to operate Firm Tech, Inc. in the ordinary course of business as it operated and existed prior to the instant dispute;

b) Defendants shall not cause any disbursements to shareholders or other transfers of funds, excluding salary,  to themselves, unless an equivalent transfer is made to all shareholders, including Plaintiff Wadsworth;

c) Defendants shall not cause the transfer or sale of any other assets of the Corporation, unless an equivalent transfer is made to all shareholders, including Plaintiff Wadsworth;

d) Defendants shall cause Firm Tech, Inc. to provide to Plaintiff's Counsel quarterly financial information, including bank statements, credit card statements and any W-2s, 1099s and information showing compensation provided to any shareholder-employees; and

e) Defendants shall also cause Firm Tech, Inc. to provide to Plaintiff's Counsel a copy of the Quickbooks file for Firm Tech, Inc. on a quarterly basis which can be in "Accountants Copy" or other similar format so as to be locked from editing.

3.

The parties shall enter into an appropriate Confidentiality Order related to the financial information produced which protects the information from disclosure to third parties but does not unduly restrict the rights of the parties, counsel or experts and others assisting Counsel to provide representation in the matter.

So ORDERED this _____ day of June, 2015.

_____
The Honorable Reuben Green
Superior Court of Cobb County

**Prepared and Presented by:**

_____
Justin O'Dell,
Attorney for Plaintiff
Georgia Bar No. 549414
506 Roswell Street, Suite 210
Marietta, Georgia 30060

**Review and Consented to as to form by:**

_____
Perry A. Phillips
Attorney for Defendants
Georgia Bar No. 576550
358 Roswell Street, Suite 1130
Marietta, Georgia  30060

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for the parties to this action with a

copy of the within and foregoing Order / Notice by depositing a copy of same in the United

States Mail, in a properly addressed envelope with adequate postage affixed thereon to:

Justin O'Dell
506 Roswell Street
Suite 210
Marietta, GA 30060

Perry A. Phillips
358 Roswell Street
Suite 1130
Marietta, GA 30060

This __11__ day __June__ 2015.

Traci L. Hatfield, Judicial Administrative Assistant
to Judge Reuben M. Green

# EXHIBIT



Domain Name: SIPARTNERS.NET
Registry Domain ID: 1985089457_DOMAIN_NET-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2015-12-01T20:02:36Z
Creation Date: 2015-12-01T20:02:36Z
Registrar Registration Expiration Date: 2017-12-01T20:02:36Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited http://www.icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDeleteProhibited
Registry Registrant ID:
Registrant Name: Eric Jordan
Registrant Organization:
Registrant Street: 3305 Rough Creek Drive
Registrant City: Woodstock
Registrant State/Province: Georgia
Registrant Postal Code: 30189
Registrant Country: US
Registrant Phone: +1.1
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: ejordan@mindspring.com
Registry Admin ID:
Admin Name: Eric Jordan
Admin Organization:
Admin Street: 3305 Rough Creek Drive
Admin City: Woodstock
Admin State/Province: Georgia
Admin Postal Code: 30189
Admin Country: US
Admin Phone: +1.1
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: ejordan@mindspring.com
Registry Tech ID:
Tech Name: Eric Jordan
Tech Organization:
Tech Street: 3305 Rough Creek Drive
Tech City: Woodstock
Tech State/Province: Georgia
Tech Postal Code: 30189
Tech Country: US
Tech Phone: +1.1
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: ejordan@mindspring.com
Name Server: NS73.DOMAINCONTROL.COM
Name Server: NS74.DOMAINCONTROL.COM
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2016-01-20T3:00:00Z <<<

For more information on Whois status codes, please visit https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

The data contained in GoDaddy.com, LLC's WHOIS database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, LLC. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section. In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.